Our fourth case this morning is United States v. Cosby. Mr. is it Soleybo? May it please the court. My name is Olani Soleybo and I along with my co-counsel Kerry Lawrenson represent the appellant in this case Ronnie Cosby on his direct appeal of his criminal conviction. Ms. Lawrenson and I are both Notre Dame students arguing under the supervision of Robert Palmer. In our brief we raised five issues however in light of our limited time and for the sake of efficiency I will argue the insufficiency of the evidence as it relates to count three. Ms. Lawrenson will discuss agent Landau's false testimony. For the other three issues we stand on the arguments as we've made in our brief. We're happy of course to address any questions posed by the court on the other three issues. The government's evidence was insufficient to convict Cosby of transportation of a minor. Mr. Soleybo before we get into that I'm going to ask you about one of the other issues specifically the continuance. The trial court denied the motion for continuance and one of the reasons the district court did so was taking into consideration the impact on the minor victims in this case. All of the victims with respect to the charges and the indictment were minor victims of sex trafficking. What impact should the victim status have when the court is weighing whether or not to grant the continuance? It certainly should have some impact your honor but it shouldn't be the decisive prong of the test. The impact on the victim certainly doesn't outweigh the time available for preparation for trial or the likelihood of prejudice or the defendant's lack of control and whatever caused the need for continuance in the first place. Our argument is that essentially if you look at those five factors almost all of the factors were out of Mr. Cosby's control and just a fortuitous event that his counsel had two other trials and had a short amount of time to prepare after getting additional evidence for this trial. Should the fact that the victims were minors and given the nature of the charges have extra weight in terms of denying a continuance or doing that balance in determining whether continuance is proper? I don't think so your honor and I haven't seen any case law to suggest that that's true but Ms. Lawrence may be able to give a fuller response to that question. Counsel came on did she not in November of 16, trial was in September of 17. So on the continuance point, what's the best argument you can make at a level of particularity and specificity with respect to prejudice? Because in the reply briefs which are well done and they're clear and all that they don't get all that particular with respect to the prejudice. Well for example your honor Ms. Conner may have been able to better prepare and brief the cell phone issue or she may have been able to better prepare or brief the dismissal for account three but the fact that she had to look at this at least what she describes as this mound of evidence a lot of which was only available to her at the government's office building after the trial had been pushed back is what made it difficult for her to resolve these issues that could come up at trial. Is it there's mention in the record I just want to get your view on it whether it's accurate or not that what was really you know new quote unquote in the discovery productions that were made was really what 50 or 75 pages something like that it wasn't you know thousands of pages that were turned over. I think the transcript refers to it as at least I think a couple of bankers box worth of paper I don't know how much that equals to but enough that she felt that it was substantial I thought the transcript said that she anticipated getting that amount but that she actually only received roughly 50 new photographs from the search warrant. And I think I remember at least a hundred pages on it on the trend in the timeline on August 11th 17 the government alerts her of additional forthcoming discovery of at least a hundred pages at the time that she's preparing for the trial and as I said earlier some of the evidence is only available to her at the government's office building as she's between trials. Mr. Slabo is there anything in the record that does clarify exactly how much she did receive because again her argument at the time that she was asking for the continuance was that she was anticipating a lot of discovery but the briefs talk about her just getting this smaller amount whether it's 50 or 100 mostly photographs from the search. Is there any place in the record that we can find the definitive answer to that? Unfortunately not off the top of my head. So turning to count three the government's evidence was insufficient to convict Cosby of transportation of a minor with intent to engage in sexual activity for two reasons. First the government failed to prove beyond a reasonable doubt that Cosby's mens rea, the requisite intent coincided with the actus reus, the action of crossing state lines. Second, the sexual activity that occurred after the return trip to Indiana despite what the trial judge said was not the dominant justification for the travel and therefore is not violative of 2423A. The difficulty that I have that would be helpful to hear your reaction to is that the only relationship that the defendant had with the victim that we're talking about here was that of sadly pimp to prostitute. There was no other, the relationship was entirely grounded in prostitution and is there anything to suggest that that's not right and in light of that text message exchange or that text message that was sent on February 12th, I mean how is that not sufficient for a rational jury to convict on that count three? Well two responses to your question your honor. First it's worth noting that yes there's nothing to suggest that they had any other relationship apart from the one that you described but there's more evidence than just that. We know that on the day they returned back to Indiana that the minor had informed John of her age and her status, that John was upset, that Mr. Cosby was upset, they immediately fled back to Hammond, Indiana where all three parties live and that evidence, that chain of events is very important because it proves, we already know that all three parties lived there so they would have returned to Hammond, Indiana anyway. And the more plausible inference for the jury looking at that evidence and everything here is that the return to Indiana, that quick flight was a result of TL informing John and Mr. Cosby fleeing and seeking to abandon the area in which they were. And it's also worth noting that TL testifies that she goes to Mr. Cosby's girlfriend's house where she had never and did not ever participate in prostitution. How do you get around the subsequent text that, where the defendant confirmed hours after the return to Indiana that they were set for Thursday in light of the February 12th text asking for something next week again? Well I think that's important for the intent piece and so we know that the men's rate must have, Mr. Cosby had the men's rate before crossing state lines. Well the text messages from the week before don't show us, one, there's no definitive plan. They don't come to a date on a true agreement and doesn't show us that Mr. Cosby had a week later that same attempt. But they would, he agreed to supply him with someone, with a girl for next week which is what he did. But circumstances change, Your Honor. We know that on the week of, right, Mr. Cosby flees back to Indiana out of fear of the T.L.'s a minor and missing. And so the government had to prove, and it tried to prove at trial, that those text messages that were received after noon were indicative of his intent before they left Illinois. But as I've said in our briefing, I'll say it again today, that's not the way intent works. It has to be before crossing state lines, not after. That's consonant with the plain reading of- Are you saying that you can't use evidence from after the fact to prove intent before? Okay. Only that the plain reading, no, Your Honor, only that the plain reading of the statute is that the mens rea must come before or during the trip. And so the government had to prove that he either had it before or that it was formed sometime during the trip. And we know the trip itself is short. He was certainly back in Indiana before he received the text messages from the acquaintance. Your Honor, if you have no additional questions, I'll turn it to Ms. Lawrenston. Thank you. May it please the court. Your Honors, my name is Carrie Lawrenson and I will argue the false testimony issue. The district court abused its discretion when it failed to declare a mistrial after the government knowingly allowed false testimony to go uncorrected when it appeared. Mr. Cosby therefore asked that this court reverse the decision of the lower courts. Mr. Cosby's due process rights were violated for three reasons. First, Agent Landau testified falsely about her involvement into the investigation of Mr. Cosby. Second, the government had knowledge about Agent Landau's false testimony. And third, this false testimony infected the truth-seeking process of the trial such that it created a reasonable likelihood of affecting the judgment of the jury. Ms. Lawrenson, why wasn't that testimony cured through what the district court did once the court learned of the false or inaccurate testimony, namely the agent was recalled and they were allowed to impeach her so the jury heard the fact that she did not give this additional information about her involvement in the case up front? Yes, Your Honor. In this case, Agent Landau did come before the jury again six days later and it's our position that that extended time gap of six days is not sufficient to cure the false testimony and for that we analogize to United States versus Freeman. In Freeman, there was a 12-day gap between when the false testimony was presented to the jury and when the prosecution team stipulated to the false evidence. And in that case, the district court determined that was a due process violation, which the Seventh Circuit agreed. And in this case, we find that to be similar, that this six-day gap simply could not cure the false testimony because that false testimony informed how the jury not only viewed Agent of the victims as well. Why wasn't it a jury issue at that point? Six days later, they heard the difference in testimony. Why wasn't it a jury issue to determine if it was just an honest mistake or if it was intentional or something that would impact her credibility? Yes, Your Honor. In this case, the district court did note that the jury would be able to determine that. However, it's our position here that this false testimony, because it happened so late, it did still have the reasonable likelihood of affecting the judgment of the jury because at the beginning of trial, Agent Landau presented herself as a completely detached and unbiased witness, which gave her a heightened sense of credibility. But then this credibility by her creating this narrative scheme of these prostitution practices was really the glue for the entire trial. And so when the subsequent victims testified, their testimony also received a heightened sense of credibility. And so at this point in time, with the six-day lapse, it's simply too late for the jury to take all of this into account when they had relied on Agent Landau's heightened sense of testimony from the very beginning. So once they heard that bell ring, it's simply impossible for them to unhear that bell. Additionally, Your Honors, as for the false testimony itself, it's important to note that in Freeman and Boyd, these cases indicate that the false testimony need not rise to the level of perjury. Rather, it's sufficient that the jury would likely to understand this evidence as something the prosecution team knew to be false, which is precisely what we have here. Agent Landau indicated that she had absolutely no involvement in the case and knew no knowledge of the facts of the case. However, reports indicate that this information was false. What impact should it have on the court, given the nature of her testimony? What she did not disclose the first time she testified was not really that much involvement in the case. She had gone with the case agent to the hotel to get some video footage and registration, and that was it. And she wasn't involved anymore afterwards. So she wasn't actively investigating the defendant. She didn't meet with the victims. It's in the scheme of things somewhat innocuous. What impact should that have on her decision? Your Honors, our position that her expert testimony witness should have a high impact on this level of false testimony. Because even though the false testimony went to her participation in the investigation of Mr. Cosby, this credibility issue that she presented to the court is something that the Supreme Court in NAPU has recognized is grounds for a false testimony claim. And in this case, her heightened testimony made her expert testimony seem even more credible, but we shouldn't view that in isolation of Agent Landau herself, but the impact that her heightened credibility had on the victim's credibility as well. She was kind of the glue for the entire trial, because when the jury heard the victim's testimony, their story fit into that narrative that Agent Landau had previously created. So this credibility issue infects the entire trial, not just Agent Landau's testimony. Additionally, Your Honors, the government's use of knowing false testimony should not be rewarded by this court. The failure to grant a mistrial sends a message that the government can get away with not correcting false testimony. For the foregoing reasons, Your Honor, we respectfully request that this court reverse the decision of the lower court. Thank you. Thank you. Mr. Holler. Good morning, Your Honors, and may it please the court. I think as so often on appeal, the main driver of the result in this case is the standard of review, and in all of these issues, the standard of review favors the government and justifies affirmance of this conviction. The court started on the continuance issue, and the district court here appropriately balanced all of the factors in this case, and it did not abuse its discretion in any way in weighing those factors. Were the victims still minors at the time of trial? Two of the victims were minors, yes, Your Honor. At the time of trial, A.C. and T.L. were both, well, A.C. certainly was still a minor at the time of trial, and I believe T.L. was 17. I think she, in fact, it might even have been like her birthday or right after her birthday, so they were still minors at the time of trial. The third victim, G.P., was already an adult at the time of the offense. She was not. But, you know, regardless of— The continuance is G.P. was actually imprisoned on a material witness warrant, correct? That was one of the reasons, yes, and also the impact on the other minor victims, one of whom was going to be taking some, like, community college courses, and the other of whom really wanted to get on with her life as well. The statutes provide special and heightened concern to minor victims, but 18 U.S.C. 3771 A.7 applies to all victims, minors and adults alike, and under the Justice for All Act provides that all victims have a right to avoid unreasonable delay. This is always a balancing act. It's always—I mean, I think the district court itself even said, there's never going to be a case where a defense attorney isn't going—or a government that is going to come and say, if I had more time, I would do this better. We all could benefit from more time. That said, these things have to be balanced, and the district court has to cut the court at some point, and the district court appropriately decided that five continuances was enough. There was two and a half years here. There was plenty of time. Judge Saini, to your question, there is no specific identification in the record of the exact amount of evidence that was, in fact, turned over. What was represented and what's in the government's letter is there was 50 pages, which was mostly search warrants of new evidence that was never before available to the defendant, and the defendant really never has made any claim that a month or a month and a half that they had is not enough time to amass 50 pages of discovery. As to exactly what number of banker's boxes the rest of the evidence took up, I don't think the answer to that question is clear. What is clear from the record and what was clear in footnote two of the government's letter is all of this information is evidence that's been available to you and to both your second and third prior lawyers since, I believe it's at least December of 2016, if not earlier, and what the government did is said, look, the way that these electronic searches work, of course, as we all know, as data accumulates, these would now, printing out, take up half of a room to accumulate all the data just on one individual's cell phone, but we went through and we found the evidence that we were actually going to admit at trial, and then we printed out that evidence and we gave the defendant that evidence and said, hey, here's what we're actually going to use. You haven't come by to check out our evidence yet, but you may want to look at this because this is the exhibits that's going to be in a trial or maybe in a trial. So, I mean, a good estimate would probably be whatever. It might well have been a banker's box, but it would have been what was stacked up in front of the jury as exhibits at trial, which often includes pages and pages of computer lines and code that then other witnesses interpret and tell you what that means or says, well, this is the code and here's the picture, and of course, the picture is what matters. Mr. Holler, did you make that, you made that production, I thought I saw a reference to trial counsel, right, shortly after her appointment? Yes. Yes, and that letter is included in our appendix. It's government appendix 25 through 30, and that letter was sent on December 8th of 2016. So this is notifying them of all of the data we have, the data we've looked at, the data we haven't looked at. I mean, it's a very comprehensive letter setting forth what all of the evidence is, and, you know, at the end of the day, though, this still goes back to standard of review. The district court considered all of the factors, every factor that this court has ever said the court should consider, considered. It considered the victims, it considered the need for counsel to have more time, it considered all of these things. It made factual findings. Defendant appendix 10, very little of the recent production is actually new. Defendant's appendix 11, the impact on the victims of the sex trafficking charges weighs heavily against further delay. Appendix 9, ample time for trial preparation since defense counsel was appointed last November. And appendix 11, on balance of continuance, did not be in the interest of justice. Those are factual findings. District courts did not abuse its discretion in making any of them. Turning to count three, the sufficiency question, again, Your Honor, there's a reason that we don't try these kinds of fact questions in the court of appeals. The jury could sit there and the jury could make these determinations, and pulling back, the defendant's only relationship with any of these minors was pimping them, as you pointed out, Judge Schuyler. With A.C., she came over initially thinking she was going to be a child prostitute. He lured her in. She ended up pimping for him. As soon as there was a dispute, she was out the door. G.P., she comes in looking for Xanax. She ends up pimping for a week. As soon as that relationship is over, she's gone. Here as well, if the relationship had ended in Illinois, the jury could reasonably infer, having heard these three girls, having heard what was going on, she would have gone. She would have been gone. The jury could reasonably infer, no, he had an ulterior motive. The only reason that he had her around was to continue to prostitute her. And the text message evidence with the John who wanted the same girl, that straddles the travel? Yes, it does. And the state line straddles the state line? Some of it happened before? Yes. So, I mean, my point is correct that the only texts that occur, well, let me see. Let me back up a second. So there's lots of texts that occur. The texts are from pages 63 to 69, so really the relevant texts are pretty much on page 67. So there's all these texts on Thursday, February 12th, when they're still in Indiana, when I think a reasonable jury could infer that there is a sex act that occurs between Kuhl and TL. And then they say, I'm going to wait until next week, okay? And he says, okay, that's on February 12th at 6.30 p.m. Okay, then they go to Illinois, and they're in Illinois, and she's prostituted to about 15 people, 15 men over four days. And then on February 16th, the cool text at 12.15 p.m., you got me set for Thursday, right? And Cosby immediately responds, yeah. Now my opponent's claim is they're back in Indiana by now. I don't think we know the answer to that question. Normal checkout time, I believe, was 11 a.m. There's really no evidence as to exactly when they checked out or when they made it back to Indiana. There just wasn't any testimony on that point. But the question here is simply, was there sufficient evidence from which the jury could find that Cosby's motive in driving her back to Indiana was to continue to pimp her? And the answer is yes. They had essentially said on Thursday, February 12th, we're going to continue to do this. Even taking the evidence in the light most favorable to him, which is not the standard, that at 10.30 they crossed back over. The fact that an hour later, when the John says, you got me set for Thursday, right, Cosby texts back one minute and six seconds later, yep, strongly suggests that he had the motive an hour earlier. It just didn't come to him in his mind like, hey, good idea. So this is a jury question. The jury could listen to these girls testify. They could listen to Cosby testify, since he chose to testify. They could look at all of the other evidence in this case, and they could assess for themselves whether it was more likely than not, whether, I'm sorry, whether it was true beyond a reasonable doubt that he did have that motive in his mind. And it doesn't have to be the sole purpose. We use the word dominant, but the court, the cases are clear, even the Snow decision from Justice Stevens when he was on this court, as well as the McGuire case, that it just has to be a purpose, an efficient purpose, a compelling purpose, a reason the transportation happened the way it did. I mean, it is certainly the case that Cosby lived in Indiana, and at some point, when he ran out of money in Illinois, he would have come back across the state line. But the jury could find the reason this happened the way it did, the reason they came back together, the reason that he took her to his girlfriend's house and she stayed with his girlfriend was for that reason. I mean, he testified in his own testimony. He also had a side job as a snowplow driver. And during parts of these times, he was out plowing snow. So the fact that he left her with his girlfriend who could keep an eye on her doesn't necessarily mean when he's out plowing snow, it doesn't necessarily mean that he didn't have the purpose of continuing to do these awful things to her. On the issue of Landau's testimony, Your Honor, we agree with you, Judge St. Eve, that any error that occurred here was cured. I would note that the district court has broad discretion on mistrial motions. The Freeman case, which is the primary case on which they rely, was a government appeal. The district court in that case determined that what in our view is a far more serious act of misconduct occurred and determined that in that case the jury wouldn't be able to put it out of its mind, that therefore a new trial was necessary, that having heard the testimony, having heard the trial, having heard everything, that this just didn't cure it. The district court here came to the opposite conclusion and this court should affirm both, just like it did in Freeman, should affirm here. What was the extent of Agent Landau's involvement here? I understood or gathered from the briefing and the record that it was fairly minimal. It was very minimal, Your Honor, and again, we included in our appendix the report itself of Agent Caduti that describes everything she ever did in this case, which is essentially, so stepping back, TL, of course, is recovered from Cosby's neighbor's house, where he's now stashed her, and Cosby's out. He's not present at the time of that. So they interview TL, and TL says, I was at this motel in Illinois, in Lansing, Illinois, that's not in Indiana, although it's actually very close by, and Agent Caduti, who operates in Indiana, somehow learns that Agent Landau, who's an FBI agent, Agent Caduti's a Homeland Security agent, that Agent Landau frequently does these cases, does investigations. The Lansing hotels are notorious for being sites of child prostitution, and he's never done a child prostitution case in Illinois. He makes a call to her. They don't even know Cosby's name. They don't even know who he is yet. She knows someone at the hotel, a manager, or someone who's got a property interest in the motel, and there's an arrangement made after hours on February 19th, is the date, February 19th of 2015, to meet there. They meet there, and then the entirety of her involvement is essentially on page 73 of the government's appendix. They met at the hotel. They spoke with General Manager Chandulal M. Patel, who did not testify at trial. The agent, or Patel provides Agent Caduti with the guest registration for Tamika Murphy, who is the girlfriend, and then video footage is being watched, surveillance footage, to try to identify who it is that went into that room, get some pictures, so they can figure out who Cosby is, and at that point, in fact, I think there's testimony, essentially, that Agent Landau's doing this as a favor. She's just kind of coming over. This is Homeland Security's case. This isn't FBI's case. She's done. She kind of, I think, I mean, I kind of got the impression she's kind of sitting there working on other cases, and at some point, it's like, can I go, you know, do you need me anymore? And off she goes. So she's making the introduction. She's making the introduction, and she's done this for other agents, on their cases and their investigations, so this does not stick out into her mind in any way as, oh, I'm involved in this case. She never even knew the defendant's name at that time. Then she gets brought in as the expert. How did the government miss this? The government, when putting Agent Landau on the stand, the case agent had testified that he told the government this. It's in the reports. How did the government miss this and not bring it down? You know, I'm not sure. There's nothing in the record that explains how the government missed it. There's always a lot going on before trial. There were two trial attorneys in this particular case. True, but prepping your witnesses and making sure that you're bringing out what you should is certainly a key thing. Oh, we aren't trying to excuse that this happened in any way. I mean, as to why it happened, I think there may have been miscommunications as to, we don't know exactly what Agent Caduti said to the AUSA. You know, she let me know that this hotel and the guy in Lansing is a far different cry from. She was actually there present. She was there while this was going on. She was there while that was going on. And if the answer was, hey, she told me what the address of was the hotel in Lansing, that may have seemed so insignificant that it wasn't something that even rose to the level of participation. It shouldn't have happened. And the government, like I said, isn't defending that it did happen. But that said, the question for this court is, did the district court abuse its discretion when it found out that it happened? I mean, the district court bent over backwards to say, look, there was some participation. There was some involvement here. She said there wasn't. That was inaccurate. Let's go and clarify this. And there was tons and tons of testimony about that a few days later in the trial. The jury understood all of that. The jury heard what was going on. And in reality, the testimony is related to the counts of conviction. Her testimony was, it didn't infect the trial. I mean, this was fairly basic testimony about what a pimp is, about what a prostitute is, about what jobs are, that these things occur at hotels, that kind of nature. And this case turned on the testimony of AC, the testimony of TL, that he took these sexually explicit pictures of me. He prostituted me out. To the extent her testimony was truly expert in nature, what we sort of think of as more, maybe from our first case, expertise, that related mostly to the count related to GP, about how pimps use heroin and use drugs and use these things to lure people in, how they play mind games with people. Because for the adult count, we had to prove force and coercion. For the minors, we just had to prove that he used them. And the jury acquitted on that count. Now whether that had anything to do with any of this or with GP's testimony or any of that, I don't know. But... Didn't she also testify, though, about how pimps get control over all of their victims, not just through the drugs and the adult victim, but how they get control and some of the psychological games they play and how they keep them under control so they don't want to leave, et cetera? That is true. But I don't think the district court abused its discretion in concluding that this could be cured on that basis. I mean, GP... Or, I'm sorry, TL testified that he took sexually explicit pictures of her. Cosby said, I didn't take those pictures. Somebody else did. AC said, he took this sexually explicit picture of me that's charged in the indictment. Cosby said, that's not her. That's somebody else. I don't think any of the expert testimony in this case had anything to do with why the jury picked the victim's story over Mr. Cosby's on those counts. If the court has no questions on the other issues, we would ask that the court also affirm on the dual witness and the suppression issue and affirm the judgment. Thank you. And who will be handling rebuttal? All right. Mr. Salivo. Three very brief points on rebuttal, Your Honors. First, two on the motion for continuance and one on count three. First, as the record states, on August 11, 2017, the government alerted the defense counsel, the trial counsel, of additional forthcoming evidence of at least 100 pages. That's the exact same day that she sought the motion for continuance. There's no way for her to know at that day that she sought the motion for continuance that the full extent of the production, that it could be more or less than what she ended up receiving. The second point on the motion for continuance is that the fact that two late teenagers are involved in this case is tragic, but it certainly should not weigh the fact that Mr. Cosby was facing a life sentence and that his attorney was so belabored that she felt she was unable to devote the time to this very complex six-day trial. Finally, if the court would indulge me, the best question to ask for count three is the question Judge Posner provided in McGuire, which is, had the sex motive not been present, would the trip have not taken place or would it have substantially differed? And the answer to that question in this case is no. The evidence at trial is that all parties, Cosby, TL, and his girlfriend, Tamika, lived in Hammond and would have returned to Hammond regardless of later criminal sexual activity. And again, the government's timeline is wrong. As the government points out, the government's timeline at trial was wrong. As the government pointed out today, the texts were received after returning to Hammond. Mr. Cosby testified that he left immediately after, the checkout time was 11, and we know the trip between Lansing and Hammond is about 11 minutes, so there's no way he received those text messages, whether it was the week of the 12th or the week of the 19th, before or while in Illinois. They all came after or before he left Indiana. We urge this court to reverse. Thank you very much. Thank you. Our thanks to all counsel and our thanks to the Notre Dame Clinic and the students for your fine work on this case on behalf of your client and the court.